# IN THE COURT OF APPEALS OF IOWA

No. 23-0592
Filed November 8, 2023

IN RE THE MARRIAGE OF AMY L. KUSTES
AND CHRISTOPHER J. KUSTES

Upon the Petition of
**AMY L. KUSTES, n/k/a AMY L. GENT,**
　　　　Petitioner-Appellant,

**And Concerning**
**CHRISTOPHER J. KUSTES,**
　　　　Respondent-Appellee.
_____

　　　　Appeal from the Iowa District Court for Keokuk County, Myron Gookin,

Judge.


　　　　Amy Gent appeals the district court's order modifying her dissolution

decree. **AFFIRMED.**


　　　　Dennis R. Mathahs, Marengo, for appellant.

　　　　Lori L. Klockau and Ellen R. Ramsey-Kacena (until withdrawal) of Bray &

Klockau, P.L.C., Iowa City, for appellee.


　　　　Considered by Bower, C.J., and Ahlers and Chicchelly, JJ.

**AHLERS, Judge.**

Christopher (Chris) Kustes and Amy Gent married in 1993 and divorced in Illinois in 2018.  They have three children—M.K. (an adult), G.K. (born in 2005), and Z.K. (born in 2009).  While Illinois uses different terminology than Iowa as it relates to physical care and legal custody of children, the parties agree that, translated into Iowa's legal terminology, their dissolution decree granted them joint legal custody of the minor children and placed physical care of the children with Amy.

Prior to finalizing the divorce, Amy moved with her new partner, Tom, to eastern Iowa.[1]  Chris remained in Illinois, and he married his current spouse, Barbara.  In 2020, Chris filed this action seeking to modify the physical-care provisions of the Illinois decree, urging the court to place the two minor children in his physical care.  He contended circumstances changed since entry of the decree that warranted placing physical care of the children with him.  Following a trial, the district court granted Chris's petition in part by modifying the decree to grant Chris physical care of Z.K.  The district court did not modify physical care of G.K., leaving her in Amy's physical care.  The decision to split physical care of the siblings was largely based on G.K.'s testimony that, if the court changed her physical care to Chris, G.K. would move back to live with Amy and complete high school at her current school when she turned eighteen, which was to occur a few months after the trial was held.  Neither party challenges the splitting of physical care of the minor children—only Z.K.'s care is at issue on appeal.

---

[1] Tom and Amy married, but they divorced about one week prior to the trial in this action.

Amy appeals. She contends Chris failed to establish a substantial and material change in circumstances warranting modification or that he is the superior caregiver. Chris asks us to affirm the district court's order and requests appellate attorney fees.

## I.  Physical Care Modification[2]

Petitions to modify physical care lie in equity, so we review the district court's decision de novo. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). With de novo review, we give weight to the findings of the district court, especially regarding credibility, but we are not bound by them. *Id.*

"A party seeking modification of a dissolution decree must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered" that affects the welfare of the children. *Id.* The change must have been more or less permanent and not contemplated by the decretal court. *Id.* "The party seeking modification . . . must also prove a superior ability to minister to the needs of the children." *Id.* Courts will only modify physical care for the most cogent reasons. *Id.* The prevailing consideration is the best interests of the children. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015).

The district court found the necessary change in circumstances based primarily on its conclusion that communication problems between the parents had worsened since the decree, Amy failed to support Chris's relationship with the

---

[2] We only consider modification of physical care with respect to Z.K. because the district court declined to modify physical care of G.K. and Chris did not file a cross-appeal to challenge that ruling. *See In re J.L.*, 973 N.W.2d 895, 899 (Iowa Ct. App. 2022) (recognizing an appellee cannot challenge an adverse ruling on appeal).

children, and Amy's relationship with Tom had a significant negative impact on the children. We address each of these bases in turn.

As to communication, Amy highlights that the parties had communication issues at the time the original decree was entered, reasoning this pre-existing concern has not worsened to warrant modification. However, the communication problems have continued and worsened over time. While Amy sent many emails to Chris, she failed to consult with or seek input from him on parenting matters since entry of the original decree. As a result, Amy has unilaterally made important decisions about the children. While this worsening of the parties' communication may not warrant a finding of substantial change in circumstances supporting a change in physical care on its own, it is a contributing factor. *See Moses v. Rosol*, No. 21-1091, 2022 WL 949749, at *2 (Iowa Ct. App. Mar. 30, 2022) (considering parents' breakdown in communication when modifying physical care provisions of a custodial decree); *In re Marriage of Aufdenberg*, No. 12-1793, 2013 WL 1749823, at *4 (Iowa Ct. App. Apr. 24, 2013) (relying on the parents' worsened communication when modifying physical care of the children). And, there's more.

Amy has been detrimental to Chris's relationship with the children. She has repeatedly interfered with his visitation by trying to change the drop-off location from the required midpoint to a location closer to her, and she has been consistently late to drop off the children. Amy has involved the children in her disagreements with Chris—painting Chris in an unfavorable light in the process. During a set thirty-minute period two nights per week when Chris was supposed to have phone visitation, frequently Amy would not have the children available on time. And, on more than one occasion, when the thirty-minute period ended, the

call would terminate on the children's end even though Chris and the children were in the middle of a conversation. The evidence also suggests the children were directed to refer to Chris as "Chris Kustes" rather than "Dad" in Amy's home. This evidence moves the needle farther toward finding a substantial change in circumstances warranting a change in physical care.

Finally, we consider Tom's actions and the negative impact they had on the children. *See In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003) ("[I]f a parent seeks to establish a home with another adult, that adult's background and his or her relationship with the children becomes a significant factor in a custody dispute. There are two reasons for this: (1) because of the place the companion will have in the child or children's lives, and (2) not less significantly, because the type of relationship the parent has sought to establish and the manner he or she has established it is an indication of where that parent's priority for his or her children is in his or her life."). There are multiple examples of Tom's negative impact on the children. Tom monitored the children's phone calls with Chris, and no one disputes that Tom was the person who terminated the phone calls in the middle of Chris's phone visitation. Shortly before Tom and Amy separated, Tom got in a physical altercation with the older minor child. Although the evidence shows Tom was responsible for the altercation, he tried to have the child arrested, removed from the house, and fired from her job. Tom made a point of attending visitation exchanges with an unconcealed firearm on him even though it was prohibited by the terms of Amy and Chris's dissolution decree and Tom knew it

made everyone, including the children, uncomfortable.[3] There is no evidence that Amy did anything to curb this practice before Tom eventually stopped attending visitation exchanges. Finally, in the two-week period before Amy and the children moved out of Tom's house, she and the children slept in a basement bedroom with the door locked each night. Amy tried to minimize the severity of the situation by refusing to acknowledge that they took those precautions to protect themselves from Tom. But the district court found, and we agree, that these actions were taken specifically to shield Amy and the children from Tom.

Amy argues Tom and his troublesome conduct should not be considered as a basis for modification because both parties knew she was going to live with Tom and that he was a bad person when the decree was entered. She reasons that since she and Chris both knew about these circumstances when the decree was entered, there has not been a substantial change of circumstances. The district court rejected this argument, and, following our de novo review, so do we. We agree with this summation by the district court on this issue:

> The issue is whether the change was within the contemplation of the court, not Chris, at the time the decree was entered from which modification is sought.[4] The court concludes the issues complained of by Chris could not reasonably have been within the contemplation of the court at the time the Illinois divorce was concluded in 2018. Even if the court knew that Amy was in a relationship with Tom and he was of questionable character, it is unreasonable to conclude the court would have contemplated Tom would physically assault G.K.,

---

[3] In his first meeting with the children's guardian ad litem, Tom was reminded that the dissolution decree prohibited the parties from bringing firearms to visitation exchanges. He responded by telling the guardian ad litem words to the effect that he is not a party to the dissolution decree, so no one can tell him that he can't take a gun to the exchanges.

[4] *See Warren v. Warren*, 191 N.W.2d 659, 661 (Iowa 1971) ("Stated otherwise, our recent emphasis has been on what the decretal court actually knew, not on what the parties knew, should have known or should have produced at the earlier trial.").

interfere with Z.K.'s ability to have phone contact with Chris, wear an unconcealed firearm to visitation exchanges and treat Amy in such a manner that she locked herself and her two children in a bedroom every night for two weeks for fear of Tom. It is unreasonable to conclude that it would have been within the Illinois court's contemplation that Tom, in words stated or parroted by Amy, would become an abusive, angry, "deplorable human being." It is also unreasonable to conclude that it was within the Illinois court's contemplation that Chris would experience increased trouble with Amy concerning communication, phone contact with the children, visitation exchanges and interference with his visitation.

The court finds and concludes that substantial and material changes in circumstances have occurred since entry of the Illinois divorce and custody orders in 2018 that justify a change in physical [care] of the children.

Amy also argues that because she is now divorced from Tom, his behavior should not be considered. We reject this argument for multiple reasons. First, while the incidents highlighted above generally occurred before Tom and Amy separated, there have also been post-separation incidents. For example, shortly after the parties separated, Tom contacted the children's guardian ad litem and falsely reported that Amy was suicidal and he was concerned for the children's safety. Also, approximately seven months post-separation and one month before the modification trial, there were at least two interactions between Tom and Amy that resulted in law enforcement involvement. These incidents suggest that Tom's presence in Amy and the children's lives is likely not over. Second, Amy's attempts to minimize the harmful effects of Tom's behavior is emblematic of her inability to nurture the children's long-term safety and growth going forward. Third, we are not willing to ignore the effects of years of controlling, and at times abusive, behavior the children suffered just because the legal relationship between Tom and Amy has ended. The children will continue to be impacted by that years-long experience for the foreseeable future. *See In re Marriage of Brainard*, 523 N.W.2d

611, 615 (Iowa Ct. App. 1994) ("Children raised in homes touched by domestic abuse are often left with deep scars, revealed in the form of increased anxiety, insecurity and a greater likelihood for later problems in interpersonal relationships."); *see also In re Marriage of Daniels*, 568 N.W.2d 51, 54 (Iowa Ct. App. 1997) ("We have previously recognized domestic abuse as a factor in determining the custodial parent.").

Considering the entire record, we conclude that Chris met his burden of establishing a substantial change of circumstances warranting consideration of modifying physical care. We turn now to whether Chris met his burden of establishing that he can provide superior care for Z.K.

The record shows that Chris has strong parenting skills. Like any parent, he is not perfect. He has not entirely hidden his animus for Amy from the children. For example, at one point he used a photo of the devil as the contact photo for Amy in his phone and set the Imperial March from Star Wars as the corresponding ringtone during a time Z.K. was allowed to use that phone to talk to Amy. That said, Chris acknowledged this was a bad decision and corrected the problem. As to this black mark on Chris's parenting record, we agree with the district court's observation "that this isolated act of immaturity by Chris pales in comparison to Amy's acts, and failures to act, in [Z.K.]'s best interest and her failure to support Chris's relationship with [Z.K.]." On the whole, Chris has shown that the children can do well in his care, Z.K. is not opposed to living with him,[5] he and his wife place

---

[5] We take the child's preference into consideration, though it is not controlling and given less weight in a modification action than in an original determination. *See Hoffman*, 867 N.W.2d. at 35.

the children in appropriate roles, and he and his wife support Z.K.'s relationship with Amy.[6]

In support of her claim that she can better care for Z.K., Amy points to evidence that both the children are doing very well in academics, extracurricular activities, and work while in her physical care. But just because the children are doing well in a stressful environment does not mean the environment should not be improved. As the district court aptly noted, "the court cannot ignore the stress and difficulties [the children] have endured leading up to trial just because they are doing well in school and are healthy." "The objective of a physical care determination is to place [a child] in the environment most likely to bring [the child] to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695. Chris has demonstrated that he can do this more effectively than Amy. Upon our de novo review, we find Chris has established a superior ability to minister to Z.K.'s needs. *See Harris*, 877 N.W.2d at 440 ("The party seeking modification of a decree's custody provisions must also prove a superior ability to minister to the needs of the children."). We do not disturb the district court's modification of the decree placing Z.K. in the physical care of Chris.

## II.    Appellate Attorney Fees

Chris requests appellate attorney fees. Appellate attorney fees in a dissolution of marriage modification proceeding are not a matter of right, but rather rest in our discretion. Iowa Code § 598.36 ("In a proceeding for the modification

---

[6] The ability of each parent to support the other's relationship with the child is a factor to consider in making a physical-care determination. *See* Iowa Code § 598.41(3)(e); *Hansen*, 733 N.W.2d at 696 (applying the custody factors listed in section 598.41(3) to physical-care determinations).

of an order or decree under this chapter the court may award attorney fees to the prevailing party in an amount deemed reasonable by the court."); *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). The factors we consider include "the needs of the party seeking the award, the ability of the other party to pay, and relative merits of the appeal." *Okland*, 699 N.W.2d at 270 (quoting *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993)). While Chris has prevailed on appeal, given the nearly five to one disparity in the parties' incomes in Chris's favor, we find Amy has negligible ability to pay and Chris has negligible need. Therefore, we deny Chris's request for appellate attorney fees.

## III.    Conclusion

The district court correctly found a substantial and permanent change in circumstances warranting modification of physical care and that it is in Z.K.'s best interests for Chris to have physical care of Z.K. So, we affirm the district court's ruling. We deny Chris's request for appellate attorney fees.

**AFFIRMED.**